Arlene LAWSON, Plaintiff,

v.

**DUTCH HERITAGE FARMS, INC., Defendant.**

No. 5:05 CV 0898.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 1, 2007.

Lee E. Plakas, Megan J. Frantz, Cheryl S. Lee, Tzangas, Plakas & Mannos, Canton, OH, Robert E. McDonald, Jr., Toronto, OH, for Plaintiff.

Anthony J. Damelio, Jr., Cleveland, OH, for Defendant.

## MEMORANDUM OPINION

GALLAS, United States Magistrate Judge.

This matter is before the court under diversity jurisdiction. Plaintiff Arlene Lawson, a resident of West Virginia, filed suit against several defendants for injuries sustained at Schrock's Amish Farm in Berlin, Ohio, while a passenger on an out-of-control horse-drawn buggy.[1] According to the amended complaint, Ms. Lawson, while visiting the farm, which is a tourist attraction, purchased a ticket for a buggy ride as advertised on the premises. She boarded the buggy with a companion, as instructed by its driver and as she was seating herself and before the driver boarded the buggy, the horse reared and bolted toward the barn. The buggy, unattended at that point, flipped and broke apart. A part of the buggy pierced Ms. Lawson's right upper thigh as she was thrown to the ground. She sustained major physical injuries. Ms. Lawson brought suit for pain and suffering, medical damages, lost wages under claims of negligence and *res ipsa loquitor* allegedly due to Dutch Heritage Farms, Inc. (Dutch Heritage) failure to exercise ordinary care in the design, operation and management of the horse-drawn buggy ride and seeks punitive damages due to willful and wanton disregard for her safety.

Defendant Dutch Heritage has moved for summary judgment under Fed.R.Civ.P. 56 raising multiple arguments, and plaintiff, Ms. Lawson has cross-motioned regarding the arguments that:

(1) Ms. Lawson's claims are barred by Ohio's Equine Activity Immunity Statute;

(2) Dutch Heritage Farms did not breach any duty owed to plaintiff.

(3) Ms. Lawson's claims are barred by the doctrine of assumption of risk.

(4) Ms. Lawson is not entitled to an award of punitive damages.

Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States*

---

1. The claims against Schrock Family Limited Partnership and Schrock Family Enterprises doing business as the Amish Experience and Amish Country Tours were resolved and stipulation to that effect was filed.

*v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson,* 600 F.2d 60, 63 (6th Cir.1979), *cert. dismissed* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). However, the nonmoving party is obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file. *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir. 1993). In the final analysis, "the threshold inquiry ... [is] whether there is a need for trial—whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *Moore,* 8 F.3d at 340. Once the nonmoving party has responded, the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n. 1 (6th Cir.2001).

*Ohio's Equine Activity Liability Act:*

The issue whether Ohio's Equine Activity Liability Act (EALA) applies to the facts in this matter is the preeminent question to be addressed on summary judgment. Ohio's EALA is not singular legislation. By 2001 it was reported that 44 states had enacted statutes protecting sponsors of equine activities by granting some form of reduced liability. See Karen Blum, Comment, *"Neigh" to North Carolina's Equine Activity Act,* 12 N.C. Cent. L.J. 156 (2001) (44 states); and see Terence Centner, *Tort Liab. for Sports and Recreational Activities: Expanded Statutory Immunity for Protected Classes and Activities,* 26 J. Legis. 1, 14 (2000) (40 states). "23 states [including Ohio, Illinois and Tennessee] have EALAs that are silent as to simple negligence as an inherent risk." 13 N.C. Cent. L.J. at 166, 179. Equine activities are viewed in most states as a major economic factor.

> With approximately 6.9 million horses in the country, the equine industry attracts a substantial portion of the United States population. Each year thirty million people will ride a horse or pony. Specifically, this means one out of every thirty-five Americans participate in a horse-related activity. Accordingly, the horse industry has a significant impact on United States economy. As a whole, horse-related businesses contributed approximately $112.1 billion to the economic well being of the country, in addition to providing $1.9 billion in taxes to the government. Moreover, the job market employs 1,404,400 persons full-time in horse-related positions. (footnotes omitted).

Lauren Speziale, Comment, *Walking Through the New Jersey Equine Activity Statute: A Look at Judicial Statutory Interpretation in Jurisdictions with Similar Limited Liability Laws,* 12 Seton Hall J. Sport L. 65, 68 (2002).

Ohio enacted its EALA in 1996 to become effective on March 3, 1997 (1996 H

564), conferring limited immunity under Ohio Rev.Code § 2305.321(B)(1) as follows:

(B)(1) Except as provided in division (B)(2)[2] of this section and subject to division (C)[3] of this section, an equine activity sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person is not liable in damages in a tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity. Except as provided in division (B)(2) of this section and subject to division (C) of this section, an equine activity participant or the personal representative of an equine activity participant does not have a claim or cause of action upon which a recovery of damages may be based against, and may not recover damages in a tort or other civil action against, an equine activity sponsor, another equine activity participant, an equine professional, a veterinarian, a farrier, or another person for harm that the equine activity participant allegedly sustained during an equine activity and that resulted from an inherent risk of an equine activity.

Ohio Rev.Code § 2305.321 (Lexis/Nexis 2005).

Ms. Lawson responds that the statute does not immunize Dutch Heritage because she was not an "equine activity participant" and her injuries were not a result of an "inherent risk of an equine activity." Further, Ms. Lawson argues that the statutory immunity was "forfeited" under Ohio Revised Code, § 2305.321(B)(2)(a) for provision of "faulty or defective equipment," and § 2305.321(B)(2)(d) for "a willful or wanton disregard for safety of an equine activity participant," either exception if proven constitutes a forfeiture of subsection B(1)'s "immunity."

Under the *Erie*-doctrine, [*Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ], "[a] federal court exercising supplemental jurisdiction over state law claims [under 28 U.S.C. § 1367] is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc., v. U.S. Trotting Ass'n.*, 174 F.3d 733, 744 (6th Cir.1999); *Chandler v. Specialty Tires of America (Tennessee), Inc.*, 283 F.3d 818, 823 (6th Cir.2002). The federal court is to "apply state law in accordance with the controlling decisions of the state supreme court." *Moore v. Detroit School Reform Bd.*, 293 F.3d 352, 359 (6th Cir. 2002), *cert. denied*, 537 U.S. 1226, 123 S.Ct. 1254, 154 L.Ed.2d 1087 (2003); *Allstate Ins. Co. v. Thrifty Rent–A–Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir.2001). When, as in this instance, the state's highest court has not decided the issue, the federal court must ascertain the state law from "all relevant data." *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995) quoting *Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985); and see *Rousey v. U.S.*, 115 F.3d 394, 397 (6th Cir.1997); *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 698 (6th Cir.2006). All relevant data includes the state's intermediate court decisions, restatements of law, law review commentaries and decisions from other jurisdictions on the "majority" rule. *Rousey*, 115 F.3d at 397; *American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 158 (6th Cir.1997).

Ohio's EALA has been interpreted in the unreported intermediate court decision

---

**2.** Subsection (B)(2) excepts certain circumstances of immunity forfeiture.

**3.** Subsection (C) provides for immunity by virtue of an equine activity liability release, a written signed waiver of listed inherent risks of equine activity.

of *McGuire v. Jewett*, to apply to farm visitors who were injured on a horse-drawn wagon ride offered by the farm operator. *Id.*, 2005 WL 1940368, 2005–Ohio–4214 (Ohio App. 11 Dist.). In *McGuire*, the horse pulling the wagon began to gallop, abruptly turned, the wagon tipped, struck several parked cars, and the family and the driver were ejected sustaining physical injuries. *Id., supra*, at * 1. The state court's decision finding immunity had been conferred was grounded on two parts of the statutory definition of **"equine activity,"** § 2305.321(A)(2)(a)(i) and (vi) which read:

(i) An equine show, fair, competition, performance, or parade that involves an equine and an equine discipline, including, but not limited to, dressage, a hunter and jumper show, grand prix jumping, a three-day event, combined training, a rodeo driving, *pulling*, cutting, reining, team penning, barrel racing, polo, steeplechasing, english or western performance riding, endurance or nonendurance trail riding, western games, hunting, packing, and recreational riding.

. . . . .

(vi) A *ride*, trip, hunt, branding, round-up, cattle drive, or other activity that involves an equine and that is sponsored by an equine activity sponsor, regardless of whether the activity is formal, informal, planned, or impromptu. (emphasis supplied)

The court also relied on the first part of the definition of **"equine activity participant"** under § 2305.321(A)(3)and subsection (a) which read:

"Equine activity participant" means a person who engaged in any of the following activities, regardless of whether the person is an amateur or a professional or whether a fee is paid to participate in the particular activity:

(a) *Riding*, training, driving, or controlling in any manner an equine, whether the equine is *mounted or unmounted.* (emphasis supplied)

The state court reasoned that since an "equine activity" included equine "pulling" and/or "riding" and a party is an "equity activity participant" if he or she is "[r]iding ... in any manner an equine, whether ... mounted or unmounted," then Ohio's EALA applies to bar recovery due to the sponsor's negligence toward the injured occupants as "equine activity participants." *Id., supra* *3. This intermediate court decision is the sole decision from an Ohio court on the issue of its EALA and immunity from liability due to injuries sustained by passengers of a horse-drawn vehicle. Cases of this nature appear to be rare events as borne out by the remarkable infrequency of similar litigation in other jurisdictions.

Wisconsin's EALA serves to demonstrate legislative intent to bar recovery for riders injured in horse-drawn vehicles. In *Kangas v. Perry*, 239 Wis.2d 392, 620 N.W.2d 429 (2000), *review denied*, 239 Wis.2d 774, 621 N.W.2d 630 (Table 2001), a Wisconsin appellate court explained that Wisconsin's EALA was unambiguous and applicable to bar recovery for injuries sustained during a fall from a horse-drawn sled when the horse unexpectedly pulled forward. Wisconsin's version has some similarity to Ohio's but predates its Ohio counterpart by about a year (Wisconsin EALA became effective May 4, 1996, see 1995 Wisc. Legis. Serv. at 256 (1995 S.B. 478 West)). However, Wisconsin's version is distinguishable by the addition to the definition of "equine activity" specific wording to include, "[r]iding, training or driving a vehicle pulled by an equine or being a passenger on a vehicle pulled by an equine." The Wisconsin legislature chose to include this language originally

and it continues to the present day. See *W.S.A.* § 895.481(1)(b)(6) (current version) and Wis. Legis. 256 (1996) (former version). Such clear indication of legislative intent on the issue of horse-drawn vehicles, though, is the exemption rather than the rule.

In contrast to the clarity on this issue in Wisconsin's EALA, in *Friedli v. Kerr*, 2001 WL 177184 (Tenn.Ct.App.), the appellate court confronted Tennessee's EALA (Tenn.Code Ann. § 44–20–102) on the issue of whether it barred recovery by passengers on a horse-drawn carriage ride through downtown Nashville. The Tennessee Appellate Court noted that under Tennessee's EALA, "equine activity sponsors,' 'equine professionals,' and others have enjoyed qualified immunity from suit in Tennessee." *Id., supra* at *3. The court began its statutory construction at the definition of "equine activity" under Tenn. Code Ann. § 44–20–102(3) which includes "[r]ides, trips, hunts, or other equine activities of any type, however informal or impromtu, that are sponsored by an equine activity sponsor." Next the court looked to the meaning of the word "participant" as "any person . . . who engages in an equine activity," and finally to the definition of "engages in an equine activity" as meaning "[r]iding, training, assisting in

medical treatment, driving, or being the passenger upon an equine, whether mounted or unmounted, or any person assisting a participant or show management." See Tenn.Code Ann. § 44–20–102(7) and § 44–20–102(1)(A). That state court reasoned that, "[a]part from participants who are 'upon' an equine, all the activities included in the statutory definition of 'engages in an equine activity' appear to require some ability to control the animal [and][f]rom a policy perspective, coupling proximity and ability to control in the definition of 'engages in an equine activity' is consistent with the principle that it would be unfair to truncate negligence claims by persons with no ability to protect themselves from injury." (footnote omitted) *Friedli,* 2001 WL 177184 at *4. The court read that the phrase "mounted or unmounted" as modifying the preceding phrase of "being a passenger upon an equine." *Id., supra,* at *4 n. 8.[4] The court concluded that the plaintiffs were not "riding, training, assisting in medical treatment of, driving or being a passenger upon an equine, whether mounted or unmounted." *Id.* at *4.[5] Further that court resolved that the defendant's carriage business was not an "equine activity" since this term encompassed similar language of "[r]ides, trips, hunts, or other equine activities of any

---

**4.** Ohio's EALA differs on the location of the phrase "mounted or unmounted." Tennessee's EALA defines "participant" as "any person . . . who engages in an equine activity" (T.C.A. § 44–20–102(7)), which in turn "engages in equine activity" is defined in relevant part as, "mean[ing] riding, training, assisting in medical treatment of, driving, or being a passenger upon an equine whether mounted or unmounted or any person assisting a participant or show management." (T.C.A. § 44–20–102(1)(A)).

Ohio's EALA combines "participant" with "engages in equine activity" and reads in relevant part, "equine activity participant means a person who engages in any of the following activities, . . .:(a) Riding, training,

driving, or controlling in any manner an equine, whether the equine is mounted or unmounted: (b) being a passenger upon an equine; [or] (c)Providing medical treatment to an equine . . ." Ohio R.C. § 2305.321(A)(3). The phrase "mounted or unmounted" cannot be applied to a "passenger," but only those "riding, training, driving, or controlling." This statutory distinction is significant.

**5.** The Tennessee appellate court also found that the buggy ride provider was not an equine activity sponsor for purposes of Tennessee Code Ann. § 44–20–102(4). Whether Dutch Heritage was an equine activity sponsor for purposes of Ohio Revised Code § 2305.321(4) has not been contested in this matter.

type ..." (Tenn.Code Ann. § 44–20–102(3)) and the same terms used under definition of the statutory "engages in an equine activity" should be given the same interpretation throughout the statute. *Id.,* at *4–*5.

*Friedli* was approved and followed in *Smith v. Lane*, 358 Ill.App.3d 1126, 832 N.E.2d 947, 295 Ill.Dec. 497 (2005). This Illinois case involved a passenger injured when a horse-drawn carriage went off the road and overturned. The defendant brought suit under both negligence and strict liability under Illinois' Animal Control Act. Defendants asserted that the carriage ride was an "equine activity" within the coverage of Illinois' EALA, 745 ILCS 47/1 et seq. (West 1996) affording them immunity from suit. See *Id,* 358 Ill. App.3d at 1128, 295 Ill.Dec. 497, 832 N.E.2d 947. In *Smith,* the court began with the premise that the Illinois legislature had chosen *not* to encompass every type of equine-related incident. *Id.* 358 Ill.App.3d at 1129, 295 Ill.Dec. 497, 832 N.E.2d 947. *Smith* further began by noting that Illinois' EALA had come under criticism for less than artful drafting.

In *Smith* the court reasoned that the only sensible way to construct legislative intent was to begin with the definitions of "participant" and "engages in equine activity," which define the requisite relationship to the offending horse which plaintiff must have for EALA protection, prior to consideration of the section defining "equine activity," which sets out the context to which the horse must be functioning for the EALA to apply. *Smith,* 358 Ill.App.3d at 1131, 295 Ill.Dec. 497, 832 N.E.2d 947. "Said another way, unless a 'participant is engaged in an equine activity', as defined in the [engages in equine activity] section, the defendant is not afforded the protection even if the 'equine activity' is one defined in the [equine activity] section, or *visa versa".* *Id.;* and see *Carl v. Resnick,*

306 Ill.App.3d 453, 457, 239 Ill.Dec. 443, 714 N.E.2d 1, 3–4 (1999);. see also *Friedli,* 2001 WL 177184 at *3.

Applying this format to interpret the statute, the Illinois appellate court found that the carriage passenger had not "engaged in an equine activity" because she had neither ridden, trained, assisted in medical treatment, driven or was a passenger "upon" an equine "whether mounted or unmounted" or assisted another participant. See 745 ILCS 47/10(c). This Illinois appellate court also agreed with *Friedli* that the words "mounted or unmounted" modified the preceding phrase being a passenger upon an equine. *Id.,* 358 Ill.App.3d at 1132, 295 Ill.Dec. 497, 832 N.E.2d 947.

*Smith's* method of construction of an EALA statute by beginning construction at the point of the definition of a "participant" is logical and especially sensible when applied to Ohio's EALA which reads that an equine activity sponsor, "... is not liable in damages in tort or other civil action for harm that an *equine activity participant* allegedly sustains during an *equine activity ...*" (emphasis supplied). See Ohio Rev.Code § 2305.321(B)(1). The obvious first step, as addressed in *Smith,* then is to determine who is an "equine activity participant" before addressing what is an "equine activity." Further Ohio's rules of statutory construction, like most if not all of its sister states, generally require that the words be given their ordinary and natural meaning unless the statute indicates that the legislature intended an alternative meaning. See *Layman v. Woo,* 78 Ohio St.3d 485, 487, 678 N.E.2d 1217, 1997–Ohio–195 (1997); *Thompson Elec., Inc. v. Bank One,* 37 Ohio St.3d 259, 264, 525 N.E.2d 761 (1988). The goal is to give effect to the legislature's intention. See *Cline v. Ohio Bur. of Motor Vehicles,* 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991).

*Friedli* and *Smith* do not constitute some form of "majority" rule that the Ohio Supreme Court would hypothetically follow. First, these two decisions conflict with a decision from an Ohio court on this issue. Second, while *Friedli* and *Smith* may serve as precedent for constructing the respective versions of EALA statutes for Tennessee and Illinois, there are critical differences in the wording within Ohio's version of the EALA, demonstrating legislative intent to include horse-drawn vehicles within its ambit. To begin, Ohio's definition of "equine activity participant" includes "spectators." Ohio Rev.Code § 2305.321(A)(3)(g). The listed "activities" of an "equine activity participant" in Ohio's version are:

(a) Riding, training, driving or controlling in any manner an equine whether the equine is mounted or unmounted;

(b) Being a passenger upon an equine;

(c) Providing medical treatment to an equine;

(d) Conducting procedures of [sic] assisting in conducting procedures necessary to breed an equine by means of artificial insemination or otherwise;

(e) Assisting a person who is engaged in an activity described in [the foregoing] division[s];

(f) Sponsoring an equine activity;

(g) *Being a spectator at an equine activity (emphasis supplied)*.

Ohio Rev.Code § 2305.321(A)(3).

In *Friedli* and *Smith* the Tennessee and Illinois versions of their respective EALAs generally excluded spectators. Tennessee's EALA reads, "Engages in an equine activity does not include being a spectator at an equine activity, except in cases where the spectator places such spectator's person in an unauthorized area and in immediate proximity to the equine activity." (See Tenn.Code Ann. § 44–2–102(1)(B)). Nearly identical language appears in Illinois' version (See 745 ILCS 47/10(a)). Ac-

cordingly in *Friedli* and *Smith* the state courts had no cause to consider whether plaintiffs in those cases could alternatively be "spectators," since plaintiffs were present in authorized areas. Becoming a "spectator" in those jurisdictions is constrained to a singular factual situation of those who place themselves in harm's way. These statutes thus contemplate that a "person" may be present at an "equine activity" but neither as a "participant" nor as a "spectator." These legislatures indicated their intent to allow three subsets of persons present: participants and spectators, to which EALAs applied; and, a third set of persons who fit within neither category.

Ohio's version, on the other hand, does not restrict the definition of spectator. If a "person" is present at an equine activity, that person becomes a participant by merely spectating. It is difficult to conceive of an excluded "activity" under this statute, given that the all-encompassing definition of "equine activity participant," which combines the functions of participants (described as riders, trainers, drivers, and passengers), veterinarians, breeders, those who assist them, sponsors and spectators.

In the Ohio intermediate court decision of *Allison v. Johnson*, the court found "spectator" was to be construed broadly by referring to several dictionaries in determining that the common meaning of "spectator" was "[a]n observer at an event," "one who looks on or beholds, ... are witnessing an exhibition," and "a person who watched without participating." *Id.*, 2001 WL 589384 at *5 (Ohio App. 11 Dist.), *appeal not allowed*, 93 Ohio St.3d 1418, 754 N.E.2d 263 (Table 2001). The court rejected plaintiff's argument that her unfortunate encounter with a gate board that rocketed into her face after being launched by a horse's kick, was as a

mere "bystander" and not a "spectator." *Allison* concluded, "that appellant was an equine activity participant by virtue of being a spectator, to-wit: an observer, watcher, or bystander." *Id.* Consequently, in contrast to at least Tennessee and Illinois, Ohio's statute demonstrates the intent to include active or passive "participation" at an equine activity. The language used in Ohio's statute does not contemplate that a "person" could be present at an equine activity in a capacity not subject to its EALA provisions.[6]

■ Ms. Lawson's presence at the buggy ride, though, cannot reasonably be construed as being merely as a "spectator." She attempts to extricate herself from the definition of "equine activity participant," maintaining that since she lacked control over the equine activity, as in *Friedli,* then she cannot be deemed to be "riding." Ms. Lawson cannot exclude herself from Ohio's EALA because it is uncontested that she rode in the Amish buggy. Although the decisions in *Friedli* and *Smith* would not accept passive riding in a vehicle and forced into their respective EALAs an element of active control, Ohio's relocation of the phrase "mounted or unmounted" and the common definition of "riding" cannot go overlooked. First, "ride" means "to be carried as in a vehicle or on horseback ... [to] travel over a surface" ... *Webster's II New Riverside Univ. Dictionary* p. 1010 (1984). Rephrased slightly in another dictionary "ride" means "[t]o be carried or conveyed, as in a vehicle or on horseback ... [t]o travel over a surface ..." *The American Heritage Dictionary of the English Language* (3d Ed.2002). In a third

dictionary ride appears as, "to sit and travel on the back of an animal that one directs ... to travel in or on a conveyance ..." *Merriam–Webster Online [www.m-w.com].* Common usage such as "riding in a car" denotes a lack of control in contrast to the phrase "driving a car." "Riding" thus does not necessarily equate with control over the equine. Second, the Tennessee and Illinois EALAs contain statutory internal inconsistency where the phrase "mounted or unmounted" is followed with "being a passenger *upon* an equine (emphasis supplied)." These statutes define a subset of participants as being both *upon* the equine and being *unmounted.* Courts in these jurisdictions therefore found it necessary to launch into judicial interpretation. Compare *Friedli,* 2001 WL 177184 at *4; *Smith,* 358 Ill.App.3d at 1130, 295 Ill.Dec. 497, 832 N.E.2d 947. Ohio's EALA does not suffer from this inconsistency.

Ohio's legislature clarified its intent by moving the phrase "whether the equine is mounted or unmounted" to neighbor "Riding, training, driving, or controlling in any manner." See Note-quoting Ohio Rev. Code § 2305.321(A)(3)(a). "Unmounted" "riding" "in any manner" includes the passive act of traveling as a passenger in a horse-drawn conveyance. The statute retains its integrity when read to include vehicle riders. Further this construction using the ordinary meanings of the words is consistent with the statute's "... single broad purpose .... to declare that certain named equine persons as well as any 'other person [are] not liable in damages in a

---

**6.** Ms. Lawson does not maintain that the carriage ride was not an "equine activity" for purposes of Ohio Rev.Code § 2305.321(A)(2). Her presence in the buggy made her an "equine activity participant," even if she were deemed to be a "spectator at an equine activity." The ride offered at the farm certainly would fall under the definition of "equine

show, fair, competition, performance, or parade" or "[a] ride, trip, hunt, [etc.] sponsored by an equine activity sponsor." See Ohio Rev.Code § 2305.321(A)(2)(a)(i) and (vi). There is also no debate over the conclusion that Dutch Heritage is an equine activity sponsor.

tort or other civil action for harm that an equine activity participant allegedly sustains during an equine activity and that results from an inherent risk of an equine activity.'" *Allison v. Johnson,* 2001 WL 589384 at *3. The terms of Ohio's EALA are clear given their common meaning and when viewed in complete context. There is no need to resort to a review of legislative history as Ms. Lawson contends. Accordingly, after reviewing state legal sources and comparing them with the law from other jurisdictions, this court concludes that the Supreme Court of Ohio would find that persons in Ms. Lawson's circumstances were "equine activity participants" under Ohio's EALA.

*Inherent Risks:*

■ This leads to the next series of arguments on whether Ms. Lawson's injuries were the result of an "inherent risk of an equine activity." See Ohio Rev.Code § 2305.321(B)(1). EALAs are acknowledged to be codifications of the affirmative defense to negligence of assumption of risk. See *Reardon v. Windswept Farm LLC,* 280 Conn. 153, 167, 905 A.2d 1156 (2006); *Frank v. Mathews,* 136 S.W.3d 196, 202 (Mo.App. W.D.2004). Accordingly, the extent of risk that an "equine activity participant" assumes is a critical factor under this codified version of Ohio's common law.[7] "Inherent risk of an equine activity" is defined as:

mean[ing] a danger or condition that is an integral part of an equine activity, including, but not limited to, any of the following:

(a) The propensity of an equine to behave in ways that may result in injury, death, or loss to persons on or around the equine;

(b) The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals;

(c) Hazards, including, but not limited to, surface or subsurface conditions;

(d) A collision with another equine, another animal, a person, or an object;

(e) The potential of an equine activity participant to act in a negligent manner that may contribute to injury, death, or loss to the person of the participant or to other persons, including, but not limited to, failing to maintain control over an equine or failing to act within the ability of the participant.

Ohio Rev.Code § 2305.321(A)(7).

Ms. Lawson argues that her injuries were not due to an inherent risk because:

(1) The horse was known to be skittish, untrustworthy and not fit to provide public carriage rides;

(2) Dutch Heritage failed to equip its carriage with an emergency brake;

(3) She was loaded on to the carriage where the driver lacked physical control over the horse; and

(4) The driver had no safety training.

Three of these arguments without question fall within the statutory definition. First, whether or not it could be anticipated that the horse would misbehave is irrelevant to whether or not there is "[t]he propensity of an equine to behave in ways that may result in injury ..." under sub-

---

7. This court has been unable to uncover a strong line of pre-statutory precedent involving injuries in single buggy accidents. One case decided prior to the Ohio's EALA effective date, however, turned in part on the fact the "[a]ppellant was experienced with horses and appreciative of the risks inherent in driving draft horses" and applied state case law on equine activities to find that plaintiff had assumed the risk of riding on the horse-drawn wagon. See *Miskovic v. Tredway,* 1993 WL 49797 at *3 (Ohio App. 6 Dist.), *appeal not allowed,* 67 Ohio St.3rd 1411, 615 N.E.2d 1045 (Table 1993).

part 7(a). Second, the driver was also an "equine activity participant" and his alleged negligence or lack of training was part of the "[t]he potential of an equine activity participant to act in a negligent manner ... including failing to maintain control ..." under subpart 7(e). Therefore Ms. Lawson's first, third and fourth alleged instances of risk consequently fall within the definition of inherent risks.

However, her first argument while falling within the rubric of equine behavior is also one of the "circumstances" of "forfeited" immunity under Ohio Rev.Code § 2305.321(B)(2)(b). Her second argument of failure to equip the carriage with a safety brake does not fall under the rubric of an inherent risk, but does fall within the immunity forfeiture provision of Ohio Rev. Code § 2305.321(B)(2)(a), where the sponsor "provides to an equine activity participant faulty or defective equipment or tack and knows or should know that the equipment or tack is faulty or defective, and that the fault or defective equipment or tack proximately causes the harm involved."

*Assumption of Risk:*

The parties present their views on the affirmative defense of assumption of risk and the court presumes that these arguments are presented alternatively to the arguments concerning Ohio's EALA. Ohio's EALA, however, does apply and consequently there is no liability for the inherent risk of an equine activity under Ohio Rev.Code § 2305.321(B)(1), unless one of the four "circumstances" of "forfeited" immunity apply.

*Failure to Determine Abilities:*

■ In attempting to argue that the buggy ride fell outside the inherent risk associated with an equine activity, Ms. Lawson presented evidence that the horse used was described as unpredictable, untrustworthy, lame, "barn sour," feisty and otherwise temperamental. This evidence does present an arguable circumstance falling outside the EALA's protection of a sponsor. Under Ohio Rev.Code § 2305.321(B)(2)(b) immunity is forfeited when the sponsor provides the equine unless the sponsor performs one of two duties:

> (b) An equine activity, sponsor, equine activity participant, equine professional, veterinarian, farrier, or other person provides an equine to an equine activity participant and *fails to make reasonable and prudent efforts* to determine the equine activity *participant's ability to safely engage in the equine activity or to safely manage the equine based on the equine activity participant's representations* of the participant's ability, the equine activity participant fails to safely engage in the equine activity or to safely manage the equine, and that failure proximately causes the harm involved (emphasis supplied).

As expressed in this statute, there is a forfeiture of the statutory immunity if the sponsor "fails to make reasonable and prudent efforts to determine" either the equine activity participant has the ability to safely engage in the equine activity, or alternatively, the participant has the ability to "safely manage the equine based on the equine activity participant's representations of the participant's ability ..." The court reads the phrase "fails to make reasonable and prudent efforts to determine" as applicable to both the participant's ability to safely engage and the participant's ability to "safely manage the equine based on a participant's representations." As this court reads Ohio's EALA provision the sponsor has a duty to make reasonable and prudent efforts to make this determination and this implies that the sponsor must elicit participant's ability to safely engage in the equine activity or alternatively make reasonable and prudent efforts

based on the participant's own representations of ability.[8]

It is only reasonable for the equine activity sponsor to carry the burden regarding the applicability of the EALA, and when so established, for the participant to counter carrying the burden to establish that "[t]he immunity from tort ... is forfeited ..." by one of the four listed "circumstances" under subsection B(2). See *Clyncke v. Waneka*, 157 P.3d 1072, 1078 (Colo.2007). There is no evidence that Dutch Heritage relied on any representations from Ms. Lawson on her ability to safely manage the carriage ride, nor has Dutch Heritage shown that it made reasonable and prudent efforts to determine her ability to safely engage in the buggy ride. Ms. Lawson carries the burden to show that Dutch Heritage failed to make reasonable and prudent efforts to determine her ability to safely engage in the carriage ride.

Dutch Heritage has established by way of its motion for summary judgment that it is entitled to the limited protection from tort liability under Ohio's EALA. Ms. Lawson has countered with evidence of the horse's reputation for being ill-natured. Dutch Heritage attests to the fact that the horse had never caused problems when used on previous buggy rides. These facts leave in question whether Dutch Heritage made "reasonable and prudent efforts to determine the equine activity participant's ability to safely engage in the equine activity" given its state of knowledge of the horse's disposition. Ms. Lawson's alleged facts together with reasonable inferences that can be drawn from these facts are

sufficient to present a genuine issue of material fact requiring resolution by trial on this "circumstance" of forfeited immunity. See *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir.2005), citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348.

*Lack of Emergency Brake:*

■ The lack of emergency brake on a horse-drawn wagon was found to constitute a genuine issue of material fact that was remanded by the 2005 decision in *McGuire* to determine whether the wagon was required to have a parking brake under the Ohio Motor Vehicle Code. See *McGuire*, 2005 WL 1940368 at *2–*3. The plaintiffs in that case had argued that the horse-drawn wagon was required to be equipped with brakes under the state's parking brake provision. This argument was rejected on remand for evidentiary hearing and on appeal in the recent 2007 decision under the majority's holding that the wagon was not operated on a public highway and therefore it was not a "vehicle" required to have parking brake system. See *McGuire v. Jewett*, 2007 WL 1810529 at *3, 2007–Ohio–3198 (Ohio App. 11 Dist.). The 2007 *McGuire* decision indicates that a horse-drawn conveyance which is only operated on private property is not a vehicle under Ohio law and does not require parking brake mechanism.

Ms. Lawson naturally does not want her case to rest on the state court decisions in *McGuire*. However, there is no dispute the horse-drawn carriage operated by Dutch Heritage was only driven on private property so no parking brake system was

<hr>

8. In Colorado's version of the EALA the legislature chose the conjunction "and" to connect the sponsor's duties to "make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity ... **and** determine the ability of the participant to safely manage the particular animal based on the participant's representa-

tions of his ability." Colo. R. S.A. § 13–21–119(4)(b)(1)(B) (emphasis added). See *Clyncke v. Waneka*, 157 P.3d 1072, 1078 (Colo.2007). Colorado's Supreme Court construed these as separate exceptions which the participant carried the burden to proved that either one applied. *Id.*, 1077–79.

required by statute. However, the statute "forfeiting" limited immunity does not limit defect or fault to circumstances of statutory noncompliance, a point brought out in the 2007 dissenting opinion in *McGuire.* Ms. Lawson believes she can demonstrate that the lack of a braking mechanism is an inherent defect or fault in the equipment provided and that this defect or fault was responsible for her injuries. Ms. Lawson is mistaken.

First, subpart B(2)(a) also requires that "the fault or defect in equipment or tack proximately causes the harm involved." Ms. Lawson has not shown how the presence of an emergency or parking brake would have prevented her injuries. As Dutch Heritage argues, an emergency braking system is simply employed when the carriage is parked on a hill so the horse does not have to hold the carriage in place or when going down the hill so that the carriage does not push the horse. (Chupp Dep. p. 35–36, Poppe Dep. p. 35–36). Plaintiff's expert, Charles Poppe claimed no testing or examination of the buggy or braking systems. There is no underlying factual basis from Mr. Poppe's statement that an emergency brake would have slowed down the horse sufficiently to allow Ms. Lawson to leave the buggy and prevent injury. (See Affidavit of Charles Poppe, Ex. 1, ¶ 10(a) attached to motion for partial summary judgment (ECF # 86)). Second, this section also has a *scienter* element of "knows or should have known that the equipment or tack is faulty or defective." Ms. Lawson fails to demonstrate that Dutch Heritage knew or should have known that the lack of an emergency brake is a defect or fault.

The evidence shows that at the time Dutch Heritage had three carriages but only one, the carriage that was the newest and had been purchased in 2002, had an emergency brake. Dutch Heritage acknowledges that in 2002 the emergency brake became a "standard feature." (Andy Hershberger Dep., p. 69). Ms. Lawson's expert, Mr. Poppe, in his affidavit stated that he is knowledgeable of the standards of care for carriage providers and drivers and that these include having an emergency brake on the carriage that has set when the horse is hitched or snapped to the hitching post and not unset until the driver is seated in the carriage seat and all passengers are seated in the carriage. (Poppe Dep., ¶ 6a). Dutch Heritage complains that these statements are conclusory and self-serving. There is no nexus between this alleged industry standard and the knowledge requirement needed for the forfeiture of the waiver. Mr. Poppe states that he was on the board of directors of the Carriage Association of America and that there are several industrial standards which Dutch Heritage is alleged to have violated. Mr. Poppe does not show how Dutch Heritage should have known the purported industry standards. He cites to no association rules, recommendations, or any publications promulgating these industry standards. So, regardless of the authenticity of the industrial standards contained in Mr. Poppe's affidavit, Ms. Lawson does not show that Dutch Heritage knew or should have known of their existence. Finally, the fact alone that the new buggy came equipped with a braking mechanism in 2002 as a standard feature does not demonstrate that Dutch Heritage knew or should have known that its older buggies were "faulty or defective." The situations between using equipment negligently and using defective equipment negligently are factually and legally distinguishable. Ms. Lawson has failed to show that Dutch Heritage knowingly provided her faulty or defective equipment.

*Willful or Wanton Disregard:*

Dutch Heritage argues that Ms. Lawson has no admissible evidence under Fed.

R.Civ.P. 56(e) to support the proposition that it acted with intent or disposition of perversity to be held liable for willful or wanton misconduct. However the meter Dutch Heritage is supplying is not correct. In *Hawkins v. Ivy*, Ohio Supreme Court found reliance on the phrase "disposition to perversity" was unnecessary. *Id.,* 50 Ohio St.2d 114, 117, 4 O.O.3d 243, 363 N.E.2d 367 (1977). Consequently, the court is inclined to favor the definitions provided in *Ohio Jury Instructions* which, to abbreviate, is conduct which would result in injury under the circumstances that defendant is aware, and willful misconduct is essentially intentional action that is wrong or failing to do what is right. Again under circumstances which must demonstrate that the defendant knew or should have known that the conduct would probably cause injury to the plaintiff. See 1 Ohio Judicial Conference, *Ohio Jury Instructions* ¶ 7.90 (2006).

 The parties have presented genuine issues of material fact on the topic of willful or wanton disregard for safety. In reaching this conclusion the court finds that Mr. Poppe's affidavit is insufficient to conclusively establish willful and wanton disregard by Dutch Heritage for purposes of summary judgment. The court points out that both degrees of culpability require awareness of the circumstances. Mr. Poppe merely sets out purported standards of care, points out that Dutch Heritage did not follow them and concludes that this was a willful or wanton disregard for safety. Again Mr. Poppe does not establish any basis for the conclusion that Dutch Heritage knew or should have known about these purported standards of care. This *scienter* requirement is again critical on this issue in determining whether or not there was willful and wanton behavior. Consequently Mr. Poppe's affidavit is conclusory and although his opinions on this ultimate issue are admissible under Fed.R.Evid. 705, this is nonetheless insufficient to establish this point for purposes of summary judgment when the expert opinion does take into account appreciation of the circumstances and knowledge that the conduct had the propensity to cause harm. See *M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hospital, Inc.,* 981 F.2d 160, 164–65 (4th Cir.1992); *Black v. Roadway Express, Inc.,* 297 F.3d 445, 454–55 (6th Cir.2002). Consequently, resolution by trial of these mixed questions of law and fact is necessary.

*Punitive Damages:*

Dutch Heritage contends that Ms. Lawson cannot recover punitive damages because she has failed to demonstrate an underlying independent compensatory damage claim. This remains to be seen because the issue of willful and wanton disregard for safety cannot be resolved on summary judgment. While a discussion of this issue is premature, the court refers the parties to the succinct explanation given on this topic in *McCombs v. Meijer, Inc.*:

> Under Ohio law, punitive damages can be awarded through a showing of clear and convincing evidence. Ohio Rev. Code § 2315.21(C). Punitive damages are available in employment discrimination cases if there is a 'finding of actual malice.' *Rice v. CertainTeed Corp.,* 84 Ohio St.3d 417, 704 N.E.2d 1217, 1220 (1999). Actual malice can be found under two circumstances: (1) if a person acts with hatred, ill will, or revenge, or (2) if a person acts with "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174, 1176 (1987). To meet the second definition, the person must 'possess knowledge of the harm that might be caused by his behavior,' *Id.* at 335, 512 N.E.2d 1174, and, nevertheless, 'con-

sciously disregard [ ] the injured party's rights or safety,' *Id.* at 336, 512 N.E.2d 1174.

*Id.*, 395 F.3d 346, 355–56 (6th Cir.2005).

Since this matter must proceed to trial on the one claim where there is a genuine issue of material fact, i.e., whether Dutch Heritage actions or omissions constituted willful or wanton disregard for safety, this court can express no opinion regarding Ms. Lawson's success on her punitive damage claim.

## CONCLUSION

For the foregoing reasons Dutch Heritage's motion for summary judgment (ECF # 79) is granted in part and denied in part and plaintiff Ms. Lawson's motion for partial summary judgment(ECF # 86) is granted and denied in part. This case will proceed on the third count of the amended complaint claiming willful or wanton disregard under Ohio Rev.Code § 2305.321(B)(2)(d), negligence under Ohio Rev.Code § 2305.321(B)(2)(b), and Ms. Lawson's claim for punitive damages.