# NO. 12-07-00143-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JANICE LEE AND BOB LEE,*<br>*APPELLANTS* | § | *APPEAL FROM THE 159TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *TERRY LOFTIN,*<br>*APPELLEE* | § | *ANGELINA COUNTY, TEXAS* |

### *OPINION*

Janice Lee and her husband, Bob Lee, appeal the trial court's order granting summary judgment in a lawsuit brought by the Lees against Terry Loftin. The Lees raise six issues on appeal. We reverse and remand.

### BACKGROUND

The Lees filed a lawsuit against Loftin for injuries Janice Lee sustained while riding one of Loftin's horses on a trail ride with Loftin. Loftin filed a traditional motion for summary judgment, arguing that chapter 87 of the Texas Civil Practice and Remedies Code barred the Lees' lawsuit. The trial court granted Loftin's motion by written order. This appeal followed.

### SUMMARY JUDGMENT

In their first issue, the Lees assert that the summary judgment evidence did not warrant the trial court's grant of summary judgment under chapter 87. Loftin asserts, as she did at summary judgment, that section 87.003 of chapter 87 precludes liability for the damages incurred as a result of Janice Lee's injury.

## Standard of Review

Rule 166a(c) governs traditional motions for summary judgment and provides as follows:

> **Motion and Proceedings Thereon.** The motion for summary judgment shall state the specific grounds therefor. . . . The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. . . .

TEX. R. CIV. P. 166a(c).

We review a trial court's grant of summary judgment de novo. ***Mid-Century Ins. Co. of Tex. v. Ademaj***, 243 S.W.3d 618, 621 (Tex. 2007). Generally, when conducting a de novo review, a reviewing court exercises its own judgment and redetermines each issue of fact and law. ***Quick v. City of Austin***, 7 S.W.3d 109, 116 (Tex. 1998). However, in the context of a summary judgment, we must examine the entire summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. ***Yancy v. United Surgical Partners Int'l, Inc.***, 236 S.W.3d 778, 782 (Tex. 2007).

For a party to prevail on a traditional motion for summary judgment, it must conclusively establish the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A fact is "material" if it affects the ultimate outcome of the lawsuit under the governing law. ***Pierce v. Wash. Mut. Bank***, 226 S.W.3d 711, 714 (Tex. App.–Tyler 2007, pet. denied). A material fact issue is "genuine" if the evidence is such that a reasonable jury could find the fact in favor of the nonmoving party. ***Pierce***, 226 S.W.3d at 714; *see **Wal-Mart Stores, Inc. v. Spates***, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam) (appellate court reviewing a summary judgment must consider whether reasonable and fair minded jurors could differ in their conclusions). Evidence is conclusive only if reasonable and fair minded jurors could not differ in their conclusions. *See **Goodyear Tire & Rubber Co. v. Mayes***, 236 S.W.3d 754, 755-56 (Tex. 2007) (per curiam) (citing ***Spates***, 186 S.W.3d at 568). Once the movant has established a right to summary judgment, the nonmovant has the burden to respond to the motion for summary judgment and present to the trial court any issues that would preclude summary judgment. ***Pierce***,

2

226 S.W.3d at 714 (citing *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979)).

In an appeal of a summary judgment proceeding, our review is a limited one. "Issues not *expressly presented* to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX. R. CIV. P. 166a(c) (emphasis added). When reviewing a summary judgment, courts of appeals should consider all summary judgment grounds ruled on by the trial court and preserved for appellate review that are necessary for final disposition of the appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996). However, an appellate court may, in the interest of judicial economy, consider other grounds that the movant preserved for review, despite the fact that the trial court did not rule on them. *Id.*

The construction of a statute is a question of law. *In re Canales*, 52 S.W.3d 698, 701 (Tex. 2001) (orig. proceeding). Therefore, we review a trial court's interpretation of a statute de novo. *Canal Ins. Co. v. Hopkins*, 238 S.W.3d 549, 561 (Tex. App.–Tyler 2007, pet. denied). In our construction of the applicable statutes in this case, we must apply the relevant rules of statutory construction found within the Texas Code Construction Act (chapter 311 of the Texas Government Code) and the common law. *Compare* TEX. GOV'T CODE ANN. § 311.002(1) (Vernon 2005) *with* TEX. CIV. PRAC. & REM. CODE ANN. § 1.001 (Vernon 2002) *and* TEX. CIV. PRAC. & REM. CODE ANN. § 1.002 (Vernon 2002). In following the common law, "[w]e must construe statutes as written and, if possible, ascertain legislative intent from the statute's language." *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001).

**Equine Activity Act**

The portions of chapter 87 relevant to our review are sections 87.001 through 87.005, now referred to as the "Equine Activity Act."[1] *See, e.g.,* Robert Fugate, *Survey of Texas Animal Torts*,

---

[1] The available legislative history materials provide insight into what legislators may have perceived as the objective of the Equine Activity Act and the circumstances under which it was enacted. The Texas House Civil Practices Committee produced a bill analysis stating that,

> [a]s a result of increased tort liability and insurance costs, equine activities in the [S]tate of Texas have suffered greatly. Twenty-eight states have adopted similar legislation and fourteen others are considering limiting equine liability. The tourism industry in Texas has been adversely affected by the expansion of liability as well as charitable, philanthropic and educational organizations.

3

48 S. Tᴇx. L. Rᴇv. 427, 460 (2006) (referring to these sections as the "Equine Activity Act"). Section 87.003 of the Act reads as follows:

**Limitation on Liability**

Except as provided by Section 87.004, any person, including an equine activity sponsor, equine professional, livestock show participant, or livestock show sponsor, is not liable for property damage or damages arising from the personal injury or death of a participant in an equine activity or livestock show if the property damage, injury, or death results from the dangers or conditions that are an inherent risk of an equine activity or the showing of an animal on a competitive basis in a livestock show, including:

(1)    the propensity of an equine or livestock animal to behave in ways that may result in personal injury or death to a person on or around it;

(2)    the unpredictability of an equine or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal;

(3)    with respect to equine activities, certain land conditions and hazards, including surface and subsurface conditions;

(4)    a collision with another animal or an object; or

(5)    the potential of a participant to act in a negligent manner that may contribute to injury to the participant or another, including failing to maintain control over the equine or livestock animal or not acting within the participant's ability.

Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ Aɴɴ. § 87.003 (Vernon 2005).[2]

The legislature's enactment of section 87.003, as part of the Equine Activity Act, altered the existing common law to provide for the application of the "inherent risk" doctrine, a version of the

---

House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); *see* House Research Org., Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); **Dodge v. Durdin**, 187 S.W.3d 523, 528-29 (Tex. App.–Houston [1st Dist.] 2005, no pet.); *see also* **Lawson v. Dutch Heritage Farms, Inc.**, 502 F. Supp. 2d 698, 700 (N.D. Ohio 2007); Loren Speziale, Comment, *Walking Through the New Jersey Equine Activity Statute: A Look at Judicial Statutory Interpretation in Jurisdictions with Similar Limited Liability Laws*, 12 Sᴇᴛᴏɴ Hᴀʟʟ J. Sᴘᴏʀᴛ L. 65, 68 (2002). To date, forty-four states have adopted similar statutes. *See* University of Vermont: Equine Activity Statutes, http://asci.uvm.edu/equine/law/equine/equ_menu.htm (last visited Jan. 29, 2009).

[2] For a general understanding of the relevant controlling law at the time the Equine Activity Act was passed, see **Pearson v. Jones Co., Ltd.**, 898 S.W.2d 329, 332 (Tex. App.–Eastland 1994, no writ). *See also* **Bushnell v. Mott**, 254 S.W.3d 451, 452-53 (Tex. 2008) (per curiam); Rᴇsᴛᴀᴛᴇᴍᴇɴᴛ (Sᴇᴄᴏɴᴅ) ᴏғ Tᴏʀᴛs §§ 506-18 (1977). For a general understanding of the relevant competing legal theories that also might have applied, see Griffin T. Pivateau, *Tackling the Competitive Sports Doctrine: A New Proposal for Sports Injuries in Texas*, 9 Tᴇx. Rᴇv. Eɴᴛ. & Sᴘᴏʀᴛs L. 85 (2007).

"assumption of the risk" doctrine, to matters set forth within section 87.003's purview.[3] *See Chrismon v. Brown*, 246 S.W.3d 102, 115 n.15 (Tex. App.–Houston [14th Dist.] 2007, no pet.); *see also Chrismon*, 246 S.W.3d at 119 n.9 (Edelman, S.J., dissenting). Generally, the inherent risk doctrine is understood to provide that "co-participant and nonparticipant defendants owe no duty to protect a participant from risks inherent in the sport or activity in which he has chosen to take part." *Sw. Key Program, Inc. v. Gil-Perez*, 81 S.W.3d 269, 272 (Tex. 2002) (citing *Phi Delta Theta Co. v. Moore*, 10 S.W.3d 658, 663 (Tex. 1999) (Enoch, J., dissenting from decision to deny petition for review)).

Applying this doctrine in the context of section 87.003, an equine activity sponsor does not owe a duty to protect a participant from risks inherent to the activity in which the participant has chosen to take part.[4] *See Sw. Key*, 81 S.W.3d at 272; *Chrismon*, 246 S.W.3d at 111. Therefore, if

---

[3] This construction of the Equine Activity Act is informed by a comparison of the statutory language found within section 87.003 with earlier cases addressing what has come to be known as the inherent risk doctrine. *Compare, e.g.,* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003 *with Knight v. Jewett*, 834 P.2d 696, 707 (Cal. 1992), *and Turcotte v. Fell*, 502 N.E.2d 964, 970 (N.Y. 1986). Likewise, this construction is consistent with the available legislative history materials related to the passage of the Equine Activity Act. *See, e.g.,* Sen. Comm. on Natural Resources, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); House Research Org., Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); *see also* Jennifer D. Merryman, Comment, *Bucking the Trend: Why Maryland Does Not Need an Equine Activity Statute and Why it May be Time to Put All of These Statutes Out to Pasture*, 36 U. BALT. L.F. 133, 143 (2006) ("These statutes are modeled after the common law . . . ."). This construction is also consistent with that of another Texas court. *See Chrismon v. Brown*, 246 S.W.3d 102, 115 n.15 (Tex. App.–Houston [14th Dist.] 2007, no pet.); *see also Chrismon*, 246 S.W.3d at 119 n.9 (Edelman, S.J., dissenting). *But see* Fugate, *Survey of Texas Animal Torts*, 48 S. TEX. L. REV. at 460. Finally, courts in other states have reached similar conclusions regarding equine statutes of like wording. *See, e.g., Lawson*, 502 F. Supp. 2d at 707; *Frank v. Mathews*, 136 S.W.3d 196, 202 (Mo. Ct. App. 2004); *see also* Merryman, *Bucking the Trend*, 36 U. BALT. L.F. at 134; Krystyna M. Carmel, *The Equine Activity Liability Acts: A Discussion of Those in Existence and Suggestions for a Model Act*, 83 KY. L.J. 157, 166-68 (1995). *But see* Sharlene A. McEvoy, *The Rise of Equine Activity Liability Acts*, 3 ANIMAL L. 201, 215 (1997). Since the Act's passage, jurists and commentators have continued to define the inherent risk doctrine using language similar to that found within the text of section 87.003. *See, e.g., Phi Delta Theta Co. v. Moore*, 10 S.W.3d 658, 662 (Tex. 1999) (Enoch, J., dissenting from decision to deny petition for review); *Chrismon*, 246 S.W.3d at 111-12; *Geiersbach v. Frieje*, 807 N.E.2d 114, 119-20 (Ind. Ct. App. 2004); Matthew G. Cole, Comment, *No Blood No Foul: The Standard of Care in Texas Owed by Participants to One Another in Athletic Contests*, 59 BAYLOR L. REV. 435, 461-62 (2007).

[4] The inherent risk doctrine is sometimes referred to as "primary assumption of the risk." *See, e.g., Knight*, 834 P.2d at 707; *Turcotte*, 502 N.E.2d at 968. The inherent risk doctrine addresses the issue of a defendant's duty to a plaintiff. *Phi Delta Theta*, 10 S.W.3d at 661-62; *Chrismon*, 246 S.W.3d at 111-12. Therefore, this doctrine does not conflict with the causation principles of proportionate fault. *See Knight*, 834 P.2d at 704, 707-08; *Turcotte*, 502 N.E.2d at 967-68; *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001-.017 (Vernon 2008). *But see* Pivateau, *Tackling the Competitive Sports Doctrine*, 9 TEX. REV. ENT. & SPORTS L. at 115-16. For the same reasons, the inherent risk doctrine does not, in the context of the case before us, conflict with the Texas Supreme Court's

a plaintiff's injury is caused in a manner consistent with the risks inherent to the particular equine activity in which the plaintiff chose to participate, the defendant will be deemed to have owed the plaintiff no duty. *See **Phi Delta Theta***, 10 S.W.3d at 662; ***Chrismon***, 246 S.W.3d at 111. While it may be necessary to first submit various disputed questions of fact to a jury, the question of whether a duty was owed to the plaintiff by the defendant is a question of law for the trial court to decide. *See **St. John v. Pope***, 901 S.W.2d 420, 424 (Tex. 1995); *see also **Steeg v. Baskin Family Camps, Inc.***, 124 S.W.3d 633, 640 (Tex. App.–Austin 2003, pet. dism'd); *cf. **Chrismon***, 246 S.W.3d at 112; ***Kolb v. Tex. Employers' Ins. Ass'n***, 585 S.W.2d 870, 873 (Tex. Civ. App.–Texarkana 1979, writ ref'd n.r.e.); Griffin T. Pivateau, *Tackling the Competitive Sports Doctrine: A New Proposal for Sports Injuries in Texas*, 9 TEX. REV. ENT. & SPORTS L. 85, 119-20 (2007).

The risk of injury, in varying degrees, is inherent in every sport or recreational activity. ***Phi Delta Theta***, 10 S.W.3d at 662; *see* Pivateau, *Tackling the Competitive Sports Doctrine*, 9 TEX. REV. ENT. & SPORTS L. at 119. This is true regardless of whether the sport or activity is organized or unorganized, contact or noncontact, and regardless of the ages of the participants. ***Phi Delta Theta***, 10 S.W.3d at 662. In determining what risks are inherent, courts should focus on the relevant risk of injury, not on the injury itself. ***Id.***

> For instance, a court might properly consider whether getting hit by an errant golf ball is a risk inherent in the sport of golf, but not whether broken teeth that result from getting hit by a golf ball is an injury inherent in golf. Or, a court might properly consider whether injury from being tackled in a football game is a risk inherent in the sport of football, but not whether a broken neck that results from a tackle is an injury inherent in football. Indeed, an injury common to a particular sport or activity (e.g., a pulled back muscle in golf) could result from a risk not inherent in that sport (e.g., the risk of being tackled by another golfer).

***Id.***

---

abrogation of the "implied assumption of the risk" doctrine, an affirmative defense related to causation. *See **Chrismon***, 246 S.W.3d at 111 n.9; *see also **Phi Delta Theta***, 10 S.W.3d at 659-60; ***Knight***, 834 P.2d at 704, 707-08; ***Turcotte***, 502 N.E.2d at 967-68; Cole, *No Blood No Foul*, 59 BAYLOR L. REV. at 462; *cf. **Farley v. M M Cattle Co.***, 529 S.W.2d 751, 758 (Tex. 1975) (abolishing the defense now referred to as implied assumption of the risk). *But see **Chrismon***, 246 S.W.3d at 119 n.9 (Edelman, S.J., dissenting); Pivateau, *Tackling the Competitive Sports Doctrine*, 9 TEX. REV. ENT. & SPORTS L. at 115-16. However, in the context of the case before us, this doctrine conflicts with the Texas Supreme Court's abrogation of the Texas "no duty" doctrine. *See **Parker v. Highland Park, Inc.***, 565 S.W.2d 512, 516-21 (Tex. 1978). Therefore, legislative action was necessary to make it applicable.

Under the inherent risk doctrine, "there are no inherent injuries, only inherent risks." *Id.* Not every injury that occurs during a sporting event or recreational activity is related to an inherent risk. *Id.* "For example, a sink hole in a public playing field is not a risk that arises from the nature of participation in some sport or activity." *Id.*; *see* Pivateau, *Tackling the Competitive Sports Doctrine*, 9 TEX. REV. ENT. & SPORTS L. at 119.

**Discussion**

As a movant for traditional summary judgment, it was Loftin's burden to conclusively establish the absence of any genuine issue of material fact and that she was entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). In their "First Amended Original Petition," the Lees alleged as follows:

> On or about February 27, 2006, Plaintiff JANICE LEE[] was invited by Defendant TERRI LOFTIN to go trail riding by horseback at Defendant's residence . . . . Upon the Plaintiff's arrival at the Defendant's residence that day, the Plaintiff was provided with a saddled horse by the Defendant and the two of them then began to ride the horses on some nearby trails through the forest. The Plaintiff was unfamiliar with the area and the choices for riding trails and the Plaintiff had to rely and depend upon the Defendant's judgment concerning the selection of riding trails that would be reasonably safe and appropriate under the existing circumstances. The Plaintiff was following behind the Defendant and[,] as they proceeded with their trail ride along the particular path chosen by the Defendant, it became very thick and overgrown with trees and bushes. At this point in the trail, the Defendant changed places so that the Plaintiff was riding in front of her. As the Plaintiff then proceeded forward she came upon a wet, boggy area in the woods and her riding horse became uneasy and anxious. Suddenly, the Defendant's horse being ridden by the Plaintiff bolted forcefully away from the boggy area[,] causing the Plaintiff to be thrown off the horse, striking a nearby tree and causing serious bodily injury to the Plaintiff.

The Lees further alleged the ways in which they claimed Loftin "fail[ed] to exercise ordinary care," proximately causing the "incident and the resulting injuries and damages incurred."[5] More specifically, the Lees contended that Loftin was negligent because she

1. failed to make a reasonable and prudent effort to determine Janice Lee's ability to engage safely in the equine activity and to safely manage the equine;

2. failed to warn Lee that the land they rode through was overgrown and boggy;

3. failed to select a safe riding trail;

---

[5] In the text quoted, the injuries and damages referred to are those of Janice Lee. However, a later portion of the petition alleged that Bob Lee also incurred damages "as a direct result of the negligence of [Loftin], as described above. . . ."

7

4.      selected an unsafe trail;

5.      selected an unsafe horse for Lee to ride;

6.      failed to investigate the safety of the selected trail in advance of the ride; and

7.      failed to lead the way during the ride.

It is undisputed that Loftin and Janice Lee were participants engaged in equine activity at the time of Lee's injury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.001(1), (3), (9) (Vernon 2005) (defining "engages in equine activity," "equine activity," and "participant"). Further, it is undisputed that Loftin was an equine activity sponsor. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.001(4) (Vernon 2005) (defining "equine activity sponsor"). We must therefore determine whether Loftin presented the trial court with sufficient evidence to conclusively establish that no material issues of fact existed so that the trial court could determine, as a matter of law, that the inherent risk doctrine precluded the Lees' negligence claim. *See* TEX. R. CIV. P. 166a(c); ***Steeg***, 124 S.W.3d at 639-40.

To reach the legal question of whether the Lees' lawsuit was precluded by section 87.003 and the inherent risk doctrine, it was Loftin's burden to conclusively establish the facts necessary to determine that Janice Lee's injuries were caused in a manner consistent with the risks inherent to the particular equine activity in question, here, a trail ride. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003; ***Sw. Key***, 81 S.W.3d at 272, ***Phi Delta Theta***, 10 S.W.3d at 662; ***Chrismon***, 246 S.W.3d at 111. Therefore, as part of Loftin's traditional summary judgment burden, she had to present evidence sufficient to conclusively establish facts by which the trial court could determine, as a matter of law, that a "risk" existed and that the "risk" was "inherent." *See **id.*** Aware of this burden, Loftin alleged in her motion for summary judgment as follows:

> [At her deposition, Plaintiff admitted that she] didn't know what happened to cause the horse to bolt, but understood that the Defendant had seen a vine wrap around the horse's leg just before the horse bolted, and testified she would not dispute that [observation] given what she had seen.
> . . . .
> Plaintiff testified [that] she had enough experience with horses to realize that if they get something wrapped around their flank they are going to jump. She admitted that appears to be what happened in this accident. She admitted that would be something she would expect to happen in a horse's normal conduct. She admitted that was one of the dangers that happens when you ride a horse.

. . . .

  Plaintiff further testified as follows: At no time before the accident did Plaintiff express any concern to the Defendant about the path they were on. At no point in time before the accident did Plaintiff feel like they needed to turn back. She realized that things like this could happen with horses even before this accident, and that that was something that's just kind of inherent in the risk of riding a horse. (Plaintiff's Deposition [p]age 41, lines 21 though 23).

. . . .

  It is undisputed that Plaintiff fell off the horse when it bolted as a result of a vine wrapping around its rear flank. Plaintiff admitted that is normal behavior for a horse, and one of the dangers that happens when you ride a horse. Plaintiff admitted that that was an inherent risk of riding a horse. This is precisely the type of case for which immunity was designed by the legislature in [section] 87.003, wherein it addresses the unpredictability of an equine to an unfamiliar object or certain land conditions and hazards . . . . As summary judgment evidence[,] Defendant attaches to this Motion as Exhibit B selected excerpts of the deposition of the Plaintiff.

According to the Lees, Janice Lee's horse "bolted" after it was exposed to a riding trail "that was too thick and overgrown for safe trail riding," and which included a "boggy, wet, low area." Loftin's summary judgment evidence, excerpts from the deposition of Janice Lee, established conclusively that, while in the boggy area, the horse provided by Loftin panicked after a vine wrapped around its flank. The evidence further established that it is not unusual for a horse to react in such a way to a vine. Therefore, Loftin established that no genuine issue of fact existed as to the material issue of whether the vine was dangerous, conclusively proving it to be so. *See* TEX. R. CIV. P. 166a(c). Likewise, Loftin conclusively established that the horse in question reacted in a normal manner to the vine, thus also conclusively establishing that the horse in question had a common, but dangerous, propensity. *See id.* Therefore, Loftin established the facts necessary for the trial court to determine that the vine, as well as the nature of the horse, were "risks," a key step to establishing immunity. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003; *Sw. Key*, 81 S.W.3d at 272; *Phi Delta Theta*, 10 S.W.3d at 662; *Chrismon*, 246 S.W.3d at 111.[6]

Nonetheless, it was likewise Loftin's burden to establish that no genuine issue of fact existed as to the material facts necessary for the trial court to determine that these "risks" were "inherent" to the activity in question, trail riding. *See* TEX. R. CIV. P. 166a(c)*; see also* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003; *Sw. Key*, 81 S.W.3d at 272; *Phi Delta Theta*, 10 S.W.3d at 662; *Chrismon*, 246 S.W.3d at 111. Without question, Loftin conclusively established that this horse's propensities

---

[6] This opinion does not address the question of whether Loftin was also required to prove facts necessary to conclude the bog to be a "risk."

were normal for a horse. However, to establish facts relating to inherency, it was incumbent on Loftin to further prove facts relating to whether exposure to Loftin's alleged "risks" was common to a *trail ride* activity. *See **Phi Delta Theta***, 10 S.W.3d at 662 ("For example, a sink hole in a public playing field is not a risk that arises from the nature of participation in some sport or activity."); Pivateau, *Tackling the Competitive Sports Doctrine*, 9 TEX. REV. ENT. & SPORTS L. at 119; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003; ***Sw. Key***, 81 S.W.3d at 272; ***Chrismon***, 246 S.W.3d at 111.

The operative petition of the plaintiffs alleged that the trail taken was unsafe. Likewise, Loftin's own summary judgment evidence shows that Janice Lee testified at her deposition as follows:

Q          Okay. Tell me what happened then.

A          I got there, you know how you do small talk, and then [Loftin] and I took off riding. . . . When we first started out, where we started out riding, it wasn't heavily wooded at all. I mean it was, you know, it was enough open that you could see.
           We rode down to the end by the arena and then we made a turn, turned back to the left and then we kind of zigzagged and was just riding . . . . It was through the woods but it wasn't very heavily wooded, it was an open area. . . . We . . . turned and went . . . into a more wooded area . . . . There was a trail and we were just winding around through the trail.

Q          Okay. Did the accident happen on a trail?

A          Yes, sir.

Q          Okay. About how many minutes elapsed between when you first started the ride and the accident?

A.         [W]e had been riding for at least an hour, probably, when it happened. . . .

. . . .

Q          Now tell me about the location where the accident happened. Was it an open area?

A          No, sir.

Q          What was in the area where the accident happened?

A          Okay. When we turned and . . . went into the woods, it was pretty overgrown. I mean there was a lot of bushes. You know how the trees will hang down and the trees are close together? When I was riding, there was trees that were brushing the sides of my legs on both sides when we rode.
           We got to one point and it had rained like the week before. . . . [W]e had already gone across some wet areas . . . but it wasn't real boggy or anything. Then we reached this one area and [Loftin] moved over . . . . [A]nd I kept going, my horse just kept going.

10

It was really boggy. [The horse] started sinking in the mud and, you know, I could feel him getting nervous underneath me and all I could think of was - - I knew I couldn't get off, I didn't feel like I could get off. All I could think of was I've got to get him turned and get him out of this so maybe it will calm him down and he won't be so upset, so that's when I turned the horse.

. . . I don't know what happened after that but he bolted . . . .

. . . .

Q     And you could see the mud before the horse went in it, right?

A     Well, it was soft. You could see it but you didn't - - *there was really nowhere else to go. It was so heavily wooded, there was nowhere else to go.*

. . . .

Q     At any time did you try to turn the horse before he went into the soft ground?

A     No, sir. *There was nowhere else to go.*

Q     *You couldn't back the horse around and go back out?*

A     *It was pretty heavily wooded. It would have been difficult.*

. . . .

Q     Did you feel like if the horse was able to handle it, you would be able to handle it?

A     Right.

Q     Do you understand that at least from [Loftin's] point of view, what she saw was a vine had wrapped around the horse's leg?

A     Yes, sir.

Q     . . . [W]ould you dispute that . . . ?

A     No, sir. . . .

Q     Right. Did you notice any vines hanging down from the trees before you got there?

A     Yes, sir.

. . . .

Q     You have enough experience with horses to realize that if they get something wrapped around their flank, they're gonna jump?

A     Yes.

. . . .

Q     That would be something you would expect in a horse's normal conduct; would it not?

11

A          Right.

Q          That's one of the dangers that happens when you ride a horse, isn't it?

A          Right.[7]

. . . .

Q          And at no time before the accident did you express any concerns to [Loftin] about the path that you were on?

A          No, sir.

Q          At any point in time before the accident did you feel like you needed to turn back?

A          No, sir.

. . . .

Q          Okay.  So what do you claim that [Loftin] did wrong in this case?  Why are you suing her?

A          . . . *Probably the biggest thing is the poor choice of riding.  I look back and we shouldn't have been riding on the trail.*

Q          But at no time before the accident had you said to [Loftin] [w]e need to turn back?

A          No, sir.

Q          Or had you felt like you needed to turn back, right?

           No, sir.

(emphasis added).

"[T]he inherent risk standard turn[s] on an analysis of the nature of the sport in question and a determination of what risks are normally created by the nature of the sport." *See **Phi Delta Theta**,* 10 S.W.3d at 663.  Here, Lee's deposition testimony presented conflicting inferences regarding the normalcy of the alleged risks present on the trail selected.  For example, Lee admitted that horses normally react poorly to vines contacting their flanks and that she never complained to Loftin about the condition of the trail or attempted to avoid the boggy area where contact with the vine was made.

---

[7] This question, despite being asked and answered in broad fashion, only addresses that a horse commonly reacts in this manner to contact with vines.  It does not address whether vines would be common to an area designated for trail rides.

However, Lee also asserted that, approximately one hour into the trail, when they approached the bog, her horse "just kept going," walking into the bog. She stated that, although she saw a combination of hanging vines and bog before her horse entered into the bog, she did not try to turn her horse to prevent it from going in because "there was nowhere else to go." When asked why she didn't "back the horse around and go back out [in the direction she had come,]" she stated that, because "it was pretty heavily wooded," it would have been "difficult" to do so. Finally, Lee testified at the end of her deposition that she faulted Loftin because of "the poor choice of riding," further stating that "I look back and we shouldn't have been riding on the trail."

In reviewing the trial court's summary judgment, we must examine the entire summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *See Yancy*, 236 S.W.3d at 782. Factual conflicts in the nonmovant's own deposition must be resolved in the nonmovant's favor where that deposition is considered as summary judgment evidence. *See Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (Tex. 1988); *Gaines v. Hamman*, 163 Tex. 618, 626, 358 S.W.2d 557, 562 (1962); *Pierce*, 226 S.W.3d at 716-17; *Hassell v. Mo. Pac. R.R. Co.*, 880 S.W.2d 39, 41 n.1 (Tex. App.–Tyler 1994, writ denied). When the summary judgment record is viewed in this light, Janice Lee's deposition testimony, which included these conflicting inferences regarding the normalcy of alleged risks present on the selected trail, fails to conclusively establish the facts necessary to support a legal determination that the "risks" alleged by Loftin were "inherent." *See Steeg*, 124 S.W.3d at 639-40. Therefore, Loftin failed to meet her summary judgment burden, *see* TEX. R. CIV. P. 166a(c), and the trial court reversibly erred by granting summary judgment. *See id.*

However, even had Loftin met her initial summary judgment burden, the result would not change. Section 87.004 of the Equine Activity Act provides an exception to the limitation on liability set forth in section 87.003.[8] *See Little v. Needham*, 236 S.W.3d 328, 333 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (interpreting section 87.004 as providing exceptions to

_____

[8] This opinion does not address the question of which party must assert and put forth evidence relating to the exceptions found with section 87.004. *Compare Little v. Needham*, 236 S.W.3d 328, 333-34 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (placing that burden on the nonmovant), *with Johnson v. Smith*, 88 S.W.3d 729, 730-33 (Tex. App.–Corpus Christi 2002, no pet.) (implicitly placing that burden on the movant).

section 87.003); ***Johnson v. Smith***, 88 S.W.3d 729, 732 (Tex. App.–Corpus Christi 2002, no pet.) (same).[9] Section 87.004 reads, in pertinent part, as follows:

**Exceptions to Limitation on Liability**

A person, including an equine activity sponsor, equine professional, livestock show participant, or livestock show sponsor, is liable for property damage or damages arising from the personal injury or death caused by a participant in an equine activity or livestock show if:

. . . .

(2)  the person provided the equine or livestock animal and the person did not make a reasonable and prudent effort to determine the ability of [a] participant to engage safely in the equine activity or livestock show and determine the ability of [that] participant to safely manage the equine or livestock animal, taking into account [that] participant's representations of ability[.]

. . . .

TEX. CIV. PRAC. & REM. CODE ANN. § 87.004 (Vernon 2005).[10] In their response to Loftin's motion for traditional summary judgment, the Lees asserted that the above exception applied to their negligence cause of action against Loftin. The Lees asserted that

[Loftin] only knew that Janice Lee wanted to start riding and otherwise made no inquiries. [Because this horse] dislike[d] . . . mud and water, he was the wrong horse, on the wrong trail . . . with a mud

---

[9] This construction of section 87.004 is informed by the plain language of the text, including its title, "Exceptions to Limitation on Liability." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.004 (Vernon 2005); *see also* TEX. GOV'T CODE ANN. § 311.023 (Vernon 2005) (permitting courts to consider the title or caption of a statute). Likewise, this construction is consistent with the available legislative history, *see, e.g.,* Sen. Comm. on Natural Resources, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995); House Research Org., Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995), other Texas courts, *see, e.g.,* ***Little***, 236 S.W.3d at 333; ***Johnson***, 88 S.W.3d at 732, and commentators, *see* Fugate, *Survey of Texas Animal Torts*, 48 S. TEX. L. REV. at 461.

[10] In this construction of section 87.004, it has been determined that subsection 2, containing the exception in question, must be read as modified above. To do otherwise would create a severe conflict in regard to the meaning of "the participant" in subsection 4, rendering that subsection nonsensical. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.004; *see also* ***Helena Chem. Co.***, 47 S.W.3d at 493 ("[W]e must always consider the statute as a whole rather than its isolated provisions."). Likewise, this construction is consistent with the available legislative history. *See, e.g.,* Sen. Comm. on Natural Resources, Bill Analysis, Tex. H.B. 280, 74th Leg., R.S. (1995) ("Sec. 87.004 . . . [p]rovides that a person is liable for property damages, injury, or death resulting from that person's negligence under specific conditions."). This construction is also consistent with that found in available commentary on the statute. *See* Fugate, *Survey of Texas Animal Torts*, 48 S. TEX. L. REV. at 461.

hole and a novice rider. Such a combination of factors foreseeably led to the severe injuries that occurred.

The Lees cited to the above deposition evidence in support of their position that Loftin's negligence in matching rider with trail caused the injury and damages in question. As such, they focused on Janice Lee's testimony that the horse became "anxious" while in the bog, which they asserted was a relevant factor in addition to the vine. They also focused on Janice Lee's other deposition testimony indicating that her riding experience was limited. Likewise, the Lees attached an affidavit from Janice Lee. The affidavit read as follows:

> About two weeks before the horse riding accident of February 27, 2006, while my husband and I were visiting the home of Terry Loftin about our horse that they were training, I mentioned that I would enjoy horse riding with them sometime in the future. They agreed that I could do that and Terry Loftin said that I could ride her mother's horse. . . .
> At no time prior to my riding accident did Terry Loftin ask me any questions regarding my horse riding experience.

Loftin offered evidence that Janice Lee did have a limited amount of experience riding horses and extensive experience breeding horses. Loftin offered no summary judgment evidence to contradict Janice Lee's claim in her affidavit that "[a]t no time prior to my riding accident did Terry Loftin ask me any questions regarding my horse riding experience." Instead, Loftin simply stated, without evidentiary support, as follows:

> [I]t should be noted that it is undisputed that [Loftin] was well aware of [Janice Lee's] knowledge of horses, and[,] in fact[,] her friendship with [Janice Lee] began by [Janice Lee] bringing one of [her] horses to [Loftin's] husband to break.

Nonetheless, viewed in its entirety, the summary judgment evidence contained proof that Janice Lee owned a number of horses for breeding and sale. It also contained proof that she seldom attempted to ride these horses (so attempting less than once per year in the aggregate). Additional evidence presented by the Lees, excerpts from Loftin's deposition, included testimony that Janice Lee told Loftin's husband that she wanted to "*start* riding" and that Lee "didn't really have anything to ride." (emphasis added). Therefore, while it was "undisputed" that Loftin was "well aware" of Janice Lee's knowledge of horse *breeding*, it was not "undisputed" that Loftin was "well aware" of Janice

15

Lee's knowledge of horse *riding*. There was no evidence directly supporting that proposition, and the Lees' evidence supported the contrary.

After examining the entire summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion, we must hold that a fact issue was presented by the Lees as to whether the exception found within subsection 2 of section 87.004 controlled. As such, summary judgment was not appropriate. *See Johnson*, 88 S.W.3d at 733 (holding that a fact issue of this type precluded summary judgment). We sustain the Lees' first issue.

**DISPOSITION**

Because we have sustained the Lees' first issue, we reverse the trial court's summary judgment order and remand the case for further proceedings.[11]

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered January __, 2009.
*Hoyle, B., Justice, concurring.*
*Griffith, S., Justice dissenting.*

**BRIAN HOYLE, Justice**

Because the summary judgment proof raises a fact issue as to whether the exception to the limitation on liability contained in section 87.004(2) applies, I agree that the trial court's summary judgment in favor of Loftin should be reversed and the case remanded for further proceedings. Because the summary judgment proof fails to raise a fact issue as to whether the limitation on liability contained in section 87.003 applies, I concur in the court's judgment by separate opinion.

**Limitation on Liability**

In construing a statute, our primary objective is to determine and give effect to the legislature's intent in enacting it. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003). In determining legislative intent, we examine the entire act, not just isolated portions. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003). We start with the plain and common meaning of the statute's words. *McIntyre*, 109 S.W.3d at 745. Unless the statute is ambiguous, we

---

[11] In their remaining five issues, the Lees' assert that "an equine sponsor's personal negligence" falls outside the liability limitations of the Act and that the Act is unconstitutional because it violates article I of the Texas Constitution and the Fourteenth Amendment to the United States Constitution. Because resolution of these issues is unnecessary to the final disposition of this appeal, this opinion does not address them. *See* TEX. R. APP. P. 47.1.

determine the legislature's intent from the language of the statute itself. ***Cont'l Cas. Co. v. Downs***, 81 S.W.3d 803, 805 (Tex. 2002). We must presume that every word of the statute has been used for a purpose and that every word excluded from the statute has been excluded for a purpose. ***Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer***, 904 S.W.2d 656, 659 (Tex. 1995). We should not insert words into the statute except to give effect to clear legislative intent. ***Id***. We presume that the legislature enacted the statute with complete knowledge of existing law and with reference to it. ***Acker v. Tex. Water Comm'n***, 790 S.W.2d 299, 301 (Tex. 1990).

Here, Loftin asserts that section 87.003 limits her liability for inherent risks of equine activity and therefore she is not liable for the Lees' injuries. Thus, the initial step in determining whether the trial court's summary judgment was proper is to decide whether the activity that is the subject of the Lees' claims involves an inherent risk of equine activity. Specifically, we must determine whether a horse's bolting when a vine touches the horse while it is in wet, boggy soil is an inherent risk of equine activity. The statute itself points us to the correct answer.

Section 87.003 provides the following nonexclusive list of inherent risks of equine activity:

> (1)     the propensity of an equine or livestock animal to behave in ways that may result in personal injury or death to a person on or around it;
>
> (2)     the unpredictability of an equine or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal;
>
> (3)     with respect to equine activities, certain land conditions and hazards, including surface and subsurface conditions;
>
> (4)     a collision with another animal or an object; or
>
> (5)     the potential of a participant to act in a negligent manner that may contribute to injury to the participant or another, including failing to maintain control over the equine or livestock animal or not acting within the participant's ability.

TEX. CIV. PRAC. & REM. CODE ANN. § 87.003 (Vernon 2005). Because section 87.003 controls here and contains a nonexclusive list of inherent risks, we may compare the facts of this case to the listed risks to decide whether, as a matter of law, the Lees' injuries resulted from an inherent risk. *See* ***Little v. Needham***, 236 S.W.3d 328, 332 (Tex. App.–Houston [1st Dist.] 2007, no pet.).

Summary judgment is proper when an activity falls within only one of the statutorily defined inherent risks, or within an inherent risk of equine activity not listed in the statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 87.003. But in this case, the activity in question falls within all five of the listed inherent risks of equine activity. ***Id.***; *see also* ***Little***, 236 S.W.3d at 332 (When a jumpy and free spirited horse that was not fully trained veered off the track causing the plaintiff to collide with a tree, the facts fell "squarely within the statutorily defined dangers or conditions that are an inherent risk of equine activity" because the facts involved both the propensity of an equine to behave in ways that may result in injury or death and a collision with an object.). Therefore, I would hold that Loftin established she was entitled to the limitation on liability provided by section 87.003, and the trial court did not err by so finding. *See* ***Little***, 236 S.W.3d at 332 (quoting ***Jorst v.***

*D'Ambrosio Bros. Invest. Co.*, No. C 00-03646 CRB, 2001 WL 969039, at *8 (N.D.Cal. Aug. 13, 2001)(not designated for publication) (Where the object with which a rider collides is a foreseeable part of riding, such as a tree branch when riding outside, the risk that a rider would brush against the object and fall is an inherent risk.).

**Exceptions to Limitations on Liability**

Determining the applicability of section 87.003 is only the first step, however. Section 87.004 creates exceptions to the limitations on liability, one of which applies when

> (2) the person provided the equine or livestock animal and the person did not make a reasonable and prudent effort to determine the ability of the participant to engage safely in the equine activity or livestock show and determine the ability of the participant to safely manage the equine or livestock animal, taking into account the participant's representations of ability[.]

TEX. CIV. PRAC. & REM. CODE ANN. § 87.004 (Vernon 2005).[12]

Viewed in the light most favorable to the Lees, the evidence establishes that Loftin never inquired of Janice Lee's riding ability. While Lee was a horse breeder, she was not actually a horse rider. Although she previously had ridden horses on a few occasions, she presented evidence that she was a novice rider and that she told Loftin she wanted to "start" riding. I understand the trial court's reluctance to find that the Lees raised a fact issue on this exception based on their theory that a horse breeder lacked the ability to negotiate a trail ride. And the Lees' proof was certainly not overwhelming. Nevertheless, I agree that the Lees' summary judgment evidence was sufficient to create a fact issue. Therefore, the summary judgment in favor of Loftin should be reversed and the case remanded to the trial court for further proceedings.

       BRIAN HOYLE
Justice

**SAM GRIFFITH, Justice**

I respectfully dissent. I would affirm the trial court's granting of Defendant/Appellee Terri Loftin's Motion for Summary Judgment.

Plaintiff/Appellant Janice Lee's First Amended Original Petition contended her injuries were the result of Loftin's failure to exercise ordinary care with regard to both failing to inquire about

---

[12] The Lees claimed that their injuries were caused by a dangerous latent condition of land, thereby invoking another exception to the limitation on liability. However, summary judgment was proper on this claim for several reasons, probably the most indisputable of which was that the vines and bog were not a latent condition of the property because Janice Lee saw the vines and the bog before entering the area. *See Little*, 236 S.W.3d at 333; *see also Gamble v. Peyton*, 182 S.W.3d 1, 4 (Tex. App.–Beaumont 2005, no pet.) (Generally, landowners have no duty to disclose risks caused by plants because such a duty would be an enormous burden bordering on absolute liability.). The Lees make no argument that the vines or wet, boggy soil were concealed. Therefore, I examine only the Lees' contention that they raised a fact issue concerning whether Loftin failed to make a reasonable and prudent effort to determine Janice Lee's riding ability.

Lee's riding ability,[13] and for failing to warn[14] Lee of the latent dangerous condition of the land upon which the trail ride[15] occurred.

Chapter 87 of the Texas Civil Practice and Remedies Code is entitled "Liability Arising from Equine Activities or Livestock Shows," and was enacted by the Texas Legislature to address the issue of liability for persons involved in equine activities and livestock shows. In drafting and enacting the legislation, the Legislature, by the Act's language, clearly recognized the inherent dangers of working around livestock and especially of riding horses. Chapter 87 provides limitation of the liability of "any person," which was very broadly defined,[16] for personal injury or death that resulted from "the dangers or conditions that are an inherent risk of an equine activity. . . ."[17] TEX.

---

[13] Lee alleged that her injuries were "proximately caused by Defendant's failure to exercise ordinary care" in "failing to make a reasonable and prudent effort to determine the ability of Janice Lee to engage safely in the equine activity and determine the ability of Janice Lee to safely manage the equine."

[14] Specifically, Lee alleged:

In failing to warn Janice Lee of a dangerous latent condition of land for which warning signs, written notices, or verbal warnings were not conspicuously posted or provided to Janice Lee, and the land was under the control of Terri Loftin at the time of the injury and Terri Loftin knew of the dangerous latent condition. In failing to select a safe trail for horseback riding. In selecting a trail for horseback riding that had a known boggy, wet, low area and then putting Janice Lee on a horse that was known to dislike the mud or water. In selecting a trail for horseback riding that was too thick and overgrown for safe trail riding with guests who were unfamiliar with the area and the horse being ridden. In failing to investigate the riding trails to determine if there were any areas along the trail that would pose a hazard or risk of harm to riding guests. In failing to lead the way along the trail ride for the safety and proper supervision of riding guests unfamiliar with the trial route and potential hazards. In allowing the Plaintiff to lead the way along the trail and into a hazardous area of water, mud and overgrowth.

[15] A trail ride is an equestrian activity whereby the riders casually ride their horses together outdoors along roads, natural trails, or through pastures, rangeland, or even forests. The activity is conducted outside an arena, a riding corral, or other more established, more sterile riding areas. The trail ride can be conducted wherever the riders wish to ride, including along unmarked routes of the riders' own choosing in wilderness areas. *See generally* ***Green v. Pool***, 421 S.W.2d 439, 440 (Tex. Civ. App.-Tyler 1967, no writ) (riding along a public road); ***Moore v. Dummet***, 478 S.W.2d 177, 179 (Tex. Civ. App.–Houston [14th Dist.] 1972, no writ) (riding together over ranch acreage).

[16] "Person" is defined as "an equine activity sponsor, equine professional, livestock show participant, or livestock show sponsor." TEX. CIV. PRAC. & REM. CODE ANN. § 87.004 (Vernon 2005).

[17] **§ 87.003. Limitation on Liability**
Except as provided by Section 87.004, any person, including an equine activity sponsor, equine professional, livestock show participant, or livestock show sponsor, is not liable for property damage or damages arising from the person injury or death of a participant in an equine activity or livestock show if the property damage, injury, or death results from the dangers of conditions that are an inherent risk of an equine activity or the showing of an animal on a competitive basis in a livestock show, including:

19

CIV. PRAC. & REM. CODE ANN. § 87.003 (Vernon 2005). Section 87.003 contains a nonexclusive list of five of the more obvious manners in which injuries can occur due to the "inherent risk" of working with livestock. The list includes such admonitions that horses have a "propensity . . . to behave in ways that may result in personal injury or death," that horses are unpredictable in their "reaction to sound, a sudden movement, or unfamiliar object, person or other animal," that injuries could result due to a horse's response to certain "activities, certain land conditions and hazards, including surface and subsurface conditions," or that injuries could result from "a collision with another animal or an object," among various enumerated risks. TEX. CIV. PRAC. & REM. CODE ANN. § 87.003.

Section 87.004 also provides exceptions to the limitation on liability of the Equine Activity Act. Although the Legislature wanted to provide protection from lawsuits for those involved in livestock operations, the protection was balanced with a recognition that a completely unskilled rider, ignorant of basic horsemanship, should be protected from dangers of which they would be unaware due to their inexperience.

Two provisions of Section 87.004 relate to the merits of Lee's litigation. First, a defendant may be held liable for damages if "the person provided the equine or livestock animal and the person did not make a reasonable and prudent effort to determine the ability of the participant to engage safely in the equine activity or livestock show and determine the ability of the participant to safely manage the equine or livestock animal, taking into account the participant's representations of ability[.]" TEX. CIV. PRAC. & REM. CODE ANN. § 87.004(2). A defendant can also be held liable for injuries if

> "the injury or death was caused by a dangerous latent condition of and for which warning signs, written notices, or verbal warnings were not conspicuously posted or provided to the participant, and the land was owned, leased, or otherwise under the control of the person at the time of the injury or death and the person knew of the dangerous latent condition."

TEX. CIV. PRAC. & REM. CODE ANN. § 87.004(3).

The present case is exactly the manner of litigation the Legislature sought to address in enacting Chapter 87 of the Texas Civil Practices and Remedies Code. As noted in Chief Justice Worthen's opinion, whether the defendant owed a duty to the plaintiff under Section 87.003 is a question of law for the trial court to decide.

The first issue raised by Lee is whether Loftin made the appropriate inquiry regarding Lee's riding ability, as provided in Section 87.004's Exceptions to Limitation on Liability. TEX. CIV.

---

> (1) the propensity of an equine or livestock animal to behave in ways that may result in personal injury or death to a person on or around it; (2) the unpredictability of an equine or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object, person, or other animal; (3) with respect to equine activities, certain land conditions and hazards, including surface and subsurface conditions; (4) a collision with another animal or an object; or (5) the potential of a participant to act in a negligent manner that may contribute to injury to the participant or another, including failing to maintain control over the equine or livestock animal or not acting within the participant's ability.

TEX. CIV. PRAC. & REM. CODE ANN. § 87.003.

PRAC. & REM. CODE ANN. § 87.004(2). It is significant that the Legislature did not include a list of questions one is to ask to establish a participant's abilities, nor are there any criteria provided to assess riding skills. Inquiries regarding riding ability would logically be more in-depth where the situation required more advanced riding skills. Thus, there should be more questions where a participant wanted to ride in a competitive calf roping or barrel racing event than would be necessary if a participant wanted to ride in a sedate trail ride.

The issue before the trial court was whether there was any genuine issue of material fact that would preclude the granting of Loftin's summary judgment motion. The trial court considered the entire summary judgment evidence, including the submitted excerpts of Loftin's and Ms. Lee's depositions, in determining whether Loftin's inquiry was sufficient to apprise her of Lee's riding ability. The trial court ruled there was not, and granted Loftin's motion.

Lee testified that she and her husband had owned horses since 1983 or 1984, and at the time of the deposition, they owned twelve horses. She admitted that she rides the horses, had been riding horses for "quite some time," but "not very often." Lee admitted she knew how to ride a horse, and needed no training on the day of the accident, saying that she did not need any training "as far as just getting on and riding" the horse. She admitted the horse was gentle. Lee agreed with the statement that "there is nothing that [Loftin] did or didn't do with regard to this horse as far as checking into your ability to ride that horse? You had the ability to do it, right?"

Lee admitted she had talked to the Loftins previously about wanting to go riding with them, and so the Loftins called and invited her. Lee's experience as a rider and as one knowledgeable about horses was demonstrated in her testimony regarding events immediately preceding the accident. Lee said she felt the horse growing nervous as the horse walked into the mud. Lee admitted she had "enough experience with horses to realize that if they get something wrapped around their flank, they're going to jump." She also agreed that the horse's jumping when the vine was wrapped around the horse's leg "would be something you would expect in a horse's normal conduct," and that "that's one of the dangers that happens when you ride a horse, isn't it?" She also admitted that she "realized that things like this could happen with horses even before this accident," and agreed "that's something that's just kind of inherent in the risk of riding a horse." Lee concluded her deposition with the statement that "I'm not upset with the fact that they asked me to come over and ride or anything like that. I have nothing against them whatsoever. Probably the biggest thing is the poor choice of riding. I look back and we shouldn't have been riding on the trail."

In her Response to Loftin's motion for summary judgment, Lee asserted that "although they owned horses, she did not ride them very often" and had not ridden a horse in the past several years "more than three or four times."

The summary judgment evidence supports the trial court's findings that there is no fact issue regarding the exceptions provided in Section 87.004, in that Lee acknowledged "there was nothing that [Loftin] did or didn't do with regard to this horse as far as checking into your [Lee's] ability to ride.'" Lee admitted she was familiar with horses and their behavior, and of the dangers of riding them. Lee further admitted she rode horses.

Therefore, I would hold that the evidence contained in the summary judgment motions clearly indicated that Mr. and Mrs. Loftin's discussion with Lee prior to allowing her to ride their horse met the requirements of Section 87.004(2), as was found by the trial court. I would sustain the trial court's ruling on that facet of Lee's appeal.

Lee's second issue addressed the alleged "dangerous latent[18] condition" of the land. In order to hold a defendant liable for injuries, the statute requires evidence that "the land be owned, leased, or otherwise under the control of the person at the time of the injury or death and the person knew of the dangerous latent condition." TEX. CIV. PRAC. & REM. CODE ANN. § 87.004(3). This provision is logical: if the defendant did not own or control the property, the defendant would be unable to conspicuously post warning signs. Further, in order to expose a defendant to liability, the defendant must be shown to have known of the existence of a dangerous latent condition of the land. If a defendant either did not own or control the property, or did not know of the latent condition of the land, the statutes's exception to the limitation of liability would not apply.

There is no question that the summary judgment evidence established that the Loftins did not own or control the land on which the accident occurred. Thus, the first requirement for the exception of the limitation to apply fails. Without contradiction, Loftin testified in her deposition that the land was owned by her neighbor who, at some unknown time in the past, had evidenced his acquiescence to her riding on his property.[19] Since Loftin neither owned nor leased the property, the question arises: how did Loftin have "control of the property" in such manner as to require her, much less to permit her, to post signs or warn Lee of "latent dangers" of the land? Clearly, based on the evidence before the trial court, Loftin did not have any control of the land, but, rather, had merely a suggestion from her neighbor that he did not object to her riding on the land. Certainly, without any right to control the land, it follows Loftin similarly had no right to "conspicuously post[]" warning signs or notices on someone else's property. Thus, the evidence adduced at the summary judgment hearing fails to comport with the requirements that the land be under Loftin's ownership or control.

Even more significant to the analysis of this case, the evidence established that the "dangerous latent condition of the land" was unknown to Loftin. Lee's First Amended Original Petition alleged that she

> was unfamiliar with the area and the choices for riding trails and the Plaintiff had to rely and depend upon Defendant's judgment concerning the selection of riding trails that would be reasonably safe and appropriate under the existing circumstances. The Plaintiff was following behind the Defendant and as they proceeded with their trail ride along the particular path chosen by the Defendant, it became very thick and overgrown with trees and bushes. At this point in the trail, the Defendant changed places so that the Plaintiff was riding in front of her. As the Plaintiff then proceeded forward she came upon a wet, boggy area in the woods and her riding horse because uneasy and anxious. Suddenly, the Defendant's horse being ridden by the Plaintiff bolted forcefully away from the boggy area causing the Plaintiff to be thrown off the horse, resulting in her injuries. This was not consistent with the evidence.

---

[18] A "latent" condition of the land is one that is "concealed." *Little v. Needham*, 236 S.W.3d 328, 333 (Tex. App.–Houston [1st Dist.] 2007, no pet.) (citing BLACK'S LAW DICTIONARY 898 (8th ed. 2004)).

[19] Q: And did you have [the land owner's] permission to ride on his property?

[Terri Loftin] A: I didn't ask him that day.

Q: Had you asked him on other days?

A: He had just made the comment that he had cleaned out some of the trails if we wanted to ride, that they were there.

Months after Loftin's neighbor mentioned that she could ride on his property,[20] when riding with Lee on the day of the accident, although it was Loftin who initially led them onto the neighbor's property at the beginning of their trail ride,  it was Lee who took over the lead position on the ride.  It was Lee who led them into a boggy, vine and brush-covered area.  Lee described how Loftin, who had been leading, "moved over, and I don't remember if she got off her horse.  I don't even recall.  I just know she moved over and I kept going, my horse just kept going."  Therefore, it was  Lee who was responsible for choosing the course of the  trail ride and was also responsible for her horse finding itself in the boggy mud, surrounded by brush and trees.[21]

Lee testified at her deposition that she was the one who directed her horse into a "really boggy" area.  Her horse began to sink into the mud, and the horse began to get nervous.  She decided to try to get him out of the boggy area and she turned her horse and headed towards a hill, and as it was going up the hill, the horse bolted.  Lee admitted that she could see the mud or soft ground before she directed her horse into the boggy area. Lee admitted she did not tell Loftin, now following her lead into the bog, that she wanted to turn around.  And Lee concluded her deposition by responding to the question, "what do you claim that Terri [Loftin] did wrong in this case?  Why are you suing her?" by responding that she was "not upset with the fact that they asked me to come over and ride or anything like that.  I have nothing against them whatsoever.  Probably the biggest thing is the poor choice of riding.  I look back and we shouldn't have been riding on the trail."  But yet the trail on which they were riding was one that Ms. Lee herself, not Loftin, chose to lead them.

Further, Loftin stated in her deposition that she did not see any wet spots, boggy spots, or standing water until after the accident.  Loftin also testified that she had ridden over the area of the accident previously and it was not "boggy and wet and anything to avoid."   Lee, by contrast, said they had already crossed a wet area "on the other side of the road," but after she rode past Loftin, her "horse just kept going. It was really boggy. . . ."  The latent boggy condition was unknown to Loftin, preventing her from warning Lee.  However, Lee had seen wet areas earlier in their ride, and, as the lead rider who was setting the route for the ride, Lee was, or should have been, on notice that wet conditions could possibly be found on the land.

Further, Loftin said the horse lunged and caused the accident after a vine touched the horse's leg and "went up into his stifle[22] and [the horse] lunged."  When asked what she had done "in the past to make sure that the trail was clear of any debris and vines and limbs and brush," Loftin responded that it was February, and there had been no recent new growth and that she had ridden the same route previously, and that it was "clear for riding purposes."  When Lee took the lead, she was responsible for deciding the course they rode.  The owner of the land on which they rode had evidently mowed some riding "paths"

---

[20] The neighbor had also mentioned he had recently mowed "paths" on his property, but the vegetation had sincere grown.  Lee described the area in the woods into which she led the "trail ride" as being "pretty overgrown. . . .  When I was riding, there was [sic] trees that were brushing the sides of my legs on both sides when we rode."

[21] There is a question of how overgrown the area was where the accident occurred.  Lee described it as very overgrown with trees and bushes all around, making it difficult to turn her horse around and leave the area without crossing through the water-soaked land.  Loftin said there were trees on one side, but the area was open on the other. However, this factual inconsistency is not germane to the disposition of the case.

[22] A stifle is "the joint of the hind leg analogous to the human knee in certain quadrupeds, such as the horse." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1266 (1978).

months before.  However, in the intervening months, vegetation had grown back up.  Had Lee wanted to ride in a riding corral, they could have done so.  However, she chose to embark on a trail ride with Loftin.

Because the land was neither owned by nor under the control of Loftin, and both parties agreed it had been Lee who led them into the boggy place where the horse jumped, and because the boggy condition of the land was unknown to Loftin, the trial court correctly entered its summary judgment in favor of Loftin on the issue of the exception to limitation of liability contained in Section 87.004(3) regarding the dangerous latent condition of the land.  I would sustain the trial court's entry of summary judgment in favor of Loftin on the second of her two issues on appeal.

Lee's appeal is predicated on two issues: That the Loftins failed to adequately inquire as to her riding ability, and that the Loftins failed to warn her of the dangerous latent condition of the land where the accident occurred.  Because the evidence supports the trial court's decision to grant  Loftin's summary judgment motion, I would affirm.

**SAM GRIFFITH**
Justice

(PUBLISH)

24



# COURT OF APPEALS
## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

**JANUARY 30, 2009**

## NO. 12-07-00143-CV

**JANICE LEE AND BOB LEE,**
Appellants

V.

**TERRY LOFTIN,**
Appellee

Appeal from the 159th Judicial District Court
of Angelina County, Texas. (Tr.Ct.No. CV-39,857-06-08)

THIS CAUSE came to be heard on oral argument and the appellate record and briefs filed herein, and the same being inspected, because it is the opinion of this Court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this Court that the judgment be **REVERSED** and the cause **REMANDED** to the trial court **FOR FURTHER PROCEEDINGS**; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Hoyle, B., Justice, concurring.*
*Griffith, S., Justice dissenting.*

# THE STATE OF TEXAS
# M A N D A T E

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**TO THE 159TH JUDICIAL DISTRICT COURT OF ANGELINA COUNTY, GREETINGS:**

Before our Court of Appeals for the 12th Court of Appeals District of Texas, on the 30th day of January, 2009, the cause upon appeal to revise or reverse your judgment between

**JANICE LEE AND BOB LEE, Appellants**

**NO. 12-07-00143-CV; Trial Court No. CV-39,857-06-08**

Opinion by James T. Worthen, Chief Justice.

**TERRY LOFTIN, Appellee**

was determined; and therein our said Court made its order in these words:

"THIS CAUSE came to be heard on oral argument and the appellate record and briefs filed herein, and the same being inspected, because it is the opinion of this Court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this Court that the judgment be **Reversed** and the cause **Remanded** to the trial court **for Further Proceedings**; and that this decision be certified to the court below for observance."

**WHEREAS, WE COMMAND YOU** to observe the order of our said Court of Appeals for the Twelfth Court of Appeals District of Texas in this behalf, and in all things have it duly recognized, obeyed, and executed.

**WITNESS, THE HONORABLE JAMES T. WORTHEN**, Chief Justice of our Court of Appeals for the Twelfth Court of Appeals District, with the Seal thereof affixed, at the City of Tyler, this the _____ day of _____, 200____.

CATHY S. LUSK, CLERK

By:_____
    Deputy Clerk